D. W. Dawkins v. Commissioner. Ashley Milk Company v. Commissioner.
Dawkins v. Commissioner
Docket Nos. 49801, 49802.
United States Tax Court
T.C. Memo 1955-178; 1955 Tax Ct. Memo LEXIS 150; 14 T.C.M. (CCH) 684; T.C.M. (RIA) 55178; June 30, 1955
Edward L. Wiese, Esq., 705 Olive Street, St. Louis, Mo., and Forrest M. Hemker, Esq., for the petitioners. Marvin E. Hagen, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: These consolidated proceedings involve deficiencies in tax and penalties as follows: D. W. Dawkins, Docket No. 49801
Sec. 293(b)
Sec. 291(a)
Year
Tax
Deficiency
Penalty
Penalty
1942
Income
$10,012.64
$ 5,006.32
1943
Income and Victory
20,826.51
10,413.26
1944
Income
31,615.08
15,807.54
1945
Income
18,274.75
9,137.38
1946
Income
27,002.78
13,501.39
Ashley Milk Company, Docket No. 49802
1942
Income
$ .84
$ 85.31 $
1944
Income
1,300.00
1946
Income
4,543.90
7,021.95
1942
Declared value excess-profits
497.43
1943
Declared value excess-profits
20.08
2,350.35
1944
Declared value excess-profits
3,547.03
3,893.30
1945
Declared value excess-profits
2,869.32
1,933.25
1942
Excess profits
6,877.54
1943
Excess profits
4,720.35
19,131.26
1944
Excess profits
21,169.21
21,762.99
10,881.50
1945
Excess profits
19,231.59
17,988.83
*151 Issues agreed upon by the parties will be reflected in the recomputation under Rule 50. The remaining issues for decision are: (1) Whether Ashley Milk Company had unreported income from sales in the amounts of $27,810 in 1944 and $31,737.29 in 1945; (2) Whether D. W. Dawkins received taxable income from the Ashley Milk Company in each of the taxable years; (3) Whether the petitioners are liable for the penalties; and (4) Whether the corporation's excess profits tax credits were properly computed. Findings of Fact The facts set forth in a stipulation of facts are so found. Petitioner D. W. Dawkins, hereinafter referred to as Dawkins, is a resident of Clayton, Missouri. He filed his returns on the cash basis with the collector of internal revenue for the first district of Missouri. Petitioner Ashley Milk Company, hereinafter referred to as the corporation, is an Illinois corporation with its principal office in St. Louis, Missouri. It was at all times during the taxable years engaged in the business of buying and collecting raw milk in Illinois and Missouri, and of manufacturing powdered, sweet, and condensed milk, ice cream mix, and other dairy products for sale at *152 wholesale. It filed its income tax returns for the taxable years with the collector for the first district of Missouri. The corporation filed timely excess profits tax returns with the same collector for the taxable years 1942, 1943, and 1945. Dawkins has at all times since 1905 operated milk plants, including receiving stations, under the name of Ashley Milk Company as a sole proprietorship, a member of a partnership, or through a corporation. Between 1919 and 1928 Dawkins realized about $47,000 from sales of plants and his father's estate. He moved to St. Louis, Missouri, in 1928, when he invested $15,000 in stock and became an officer and director of the Arctic Ice Cream Company. The corporation was organized May 7, 1931, by Phoebe B. Dawkins, the wife of Dawkins, Gail Shelton, and O. K. Allen, with a paid-in capital of $10,000 consisting of 100 shares of a par value of $100 each, to engage in, among other things, the business of buying and selling of milk and dairy products in Ashley and Nashville, Illinois. At no time was there any addition to the capital of $10,000. The authorized stock was issued for the net assets of a business as of January 1, 1931. Ninety-eight shares *153 of the corporation were issued in the name of Phoebe B. Dawkins and one share each in the name of Gail Shelton and O. K. Allen. The books of the corporation contain a journal entry on December 31, 1931, crediting the account of Dawkins with $984.23 for an adjustment of his account for the four months prior to incorporation. His ledger account on the books of the corporation contains debits and credits on and after June 30, 1931, with a debit balance of $31.58 at the close of the year. On December 1, 1935, the original certificates of stock of the corporation were surrendered and cancelled and reissued as follows: Phoebe B. Dawkins
95 Shares
D. W. Dawkins
3 Shares
Madeline Dawkins
1 Share
Francis Dawkins
1 Share
Madeline Dawkins and Francis Dawkins are the daughter and son, respectively, of Dawkins. No other stock certificates were issued thereafter. The stock certificates issued in the name of Phoebe B. Dawkins were endorsed in blank for transfer. Dawkins' wife has always been a housewife and not a business woman. She has never taken any part in the management or operation of the corporation and never rendered any service to its predecessor. Dawkins *154 was elected president, treasurer and manager of the corporation in 1935. He has been in complete control of the operations of the corporation since its organization and at all times important owned all of its stock. During the taxable years Dawkins maintained a personal checking account with the Ashley State Bank, Ashley, Illinois. The corporation's regular bank account was with the American Exchange National Bank, St. Louis, Missouri, where, since August 27, 1942, the corporation has had a safe deposit box, to which Dawkins and his wife and daughter had access. Dawkins also had space in a safety vault in the Ashley State Bank. In November 1946 a revenue agent commenced a routine examination of the income tax returns of the corporation for the years 1942 to 1945, inclusive. The corporation had previously filed claims for refund for 1942 and 1943 based upon a carry-back loss in 1944. As a result of the investigation, refund claims for 1942 and 1943 were allowed and a deficiency was determined for 1945, which the revenue agent discussed with Dawkins in December 1946. Dawkins did not at that time disclose to the revenue agent that the corporation had substantial unreported sales *155 during any of the taxable years. In January 1947 the corporation consented to assessment and collection of the deficiency for 1945. In February 1947 another revenue agent contacted Dawkins about an investigation of his return for 1945 and was advised by him to get in touch with Lee J. Muren, a certified public accountant, who had been the corporation's outside accountant since 1937, which the revenue agent did on March 17, 1947, and obtained an appointment for March 19th at the office of Muren. Muren informed him that the amount of $3,000 reported by Dawkins as salary from the Pan American Candy Company should be $6,000, and that Dawkins owned that company and the corporation. The revenue agent continued the examination in the office of Dawkins on March 20, 1947. A few days before Dawkins left during the early part of January 1947 for the southwest for health reasons, he informed an attorney that he desired to discuss some tax matters with him upon his return to St. Louis. Dawkins consulted him again on March 17, 1947, saying that he wished to discuss with him without delay the tax problems mentioned in January. The attorney could not consult with him until the night of March 20, 1947, when *156 Dawkins informed him, in general, that he had diverted to himself for his own use, proceeds of sales of the corporation without having the sales or the payments recorded on the books of the corporation. As a result of the disclosure by Dawkins to his attorney, they and Muren held a meeting on March 23, 1947, in the office of the corporation for the purpose, among other things, of ascertaining the extent of the diversions. Dawkins informed them that his diversions were about $150,000 during the taxable years, that he wanted to include the amount in amended returns of the corporation, and pay the tax he knew was due the Government. At that time, or within a few days, Dawkins delivered to Muren a separate record kept by him showing the amounts of his diversions of sales receipts of the corporation. At the suggestion of Muren, Dawkins concluded to file amended returns based upon estimated amounts for unreported sales. The amounts diverted as disclosed in Dawkins' records, and the estimated amounts included in amended income and excess profits tax returns, and an original excess profits tax return for 1944, were as follows: Dawkins'
Year
Records
Estimated
1942
$15,790.74
$20,000.00
1943
43,768.81
45,000.00
1944
49,061.42
50,000.00
1945
None
10,000.00
1946
23,600.00
25,000.00
Total
$132,220.97
$150,000.00
*157 The original and amended returns of the corporation were signed by Dawkins as president. The returns so prepared disclosed additional tax liability of about $95,000, which was paid upon the filing of the returns with the collector for the first district of Missouri on March 26, 1947. Promptly thereafter the internal revenue agent in charge at St. Louis was advised of the filing of the returns and the reasons therefor, and Muren, acting under instructions of Dawkins, requested the office personnel of the corporation to ascertain the extent of the unrecorded sales. On March 26, 1947, Dawkins delivered to the corporation and the corporation deposited in its checking account a total of $90,494.06, consisting of the following items: Government bonds, including in-
terest
$40,127.37
Cash
24,923.54
Cashier's check, dated Oct. 25,
1946, payable to the corpora-
tion
7,343.15
Cashier's check payable to bearer
7,500.00
Personal checks of Dawkins
10,600.00
Total
$90,494.06
The first three items of deposit, totaling $72,394.06, had been removed the same day by Dawkins from the corporation's safe deposit box. The corporation credited the amount of the deposit *158 to the personal account of Dawkins. After the returns were filed in March 1947, a special agent and the revenue agent conducted an investigation of the returns of Dawkins and the corporation for the taxable years, extending which the special agent spent a total of from 4 to 5 weeks in the office of the corporation checking books and records relating to sales. The customers of the corporation during each of the taxable years ranged from about 30 to 65, of which from about 12 to 25 were its principal customers, measured in dollars. The books reflected that in 1944 and 1945 the corporation had about 25 customers whose purchases were in excess of $1,000 each year and that substantially all of its sales were made to about 15 regular customers. The investigating agents checked the major accounts receivable of the corporation with the purchasing accounts of the customers. Their examination continued as long as they thought it was profitable to work. The books and records of the corporation were made available to them and the special agent received very good cooperation from employees of the corporation during the course of his examination. All invoices prepared for sales of the corporation *159 were sent to Dawkins for approval before being mailed to the customers, and all of the corporation's mail was opened by him. Invoices for sales, the proceeds of which he intended to divert to himself, were retained by Dawkins and never reached a bookkeeper for appropriate entries in the corporate books. During the years 1942, 1943, 1944, and 1946 Dawkins collected and diverted to his own use the following amounts representing proceeds of sales made by him for the corporation, none of which was recorded on its books or included in its original income tax returns, or income tax returns of Dawkins: Year
Amount
1942
$ 18,563.17
1943
45,152.11
1944
49,061.42
1946
35,763.38
Total
$148,540.08 The amounts so diverted constituted distributions of the corporation to Dawkins as its sole stockholder. Of the amount collected and withheld by Dawkins in 1942, $11,805.02 represented the proceeds of three checks of the Tip Top Creamery Company for purchases made in November and December of that year. The corporation had no account on its books in 1942 for the Tip Top Creamery Company. Some of the sales made to it in 1943 were entered in the corporation's books. The *160 checks, 45 in number, issued by customers for the amounts diverted by Dawkins were made payable to the corporation. Of the checks, 37 totaling $96,636.02, were cashed by Dawkins and the proceeds deposited in the safe deposit box of the corporation; two, totaling $8,092, were deposited in the corporation's bank account in 1944 with a credit to the personal account of Dawkins on the books of the corporation; two, totaling $15,138.60, were used by Dawkins to purchase cashier's checks payable to bearer, one of which, in the amount of $7,500, was deposited in the corporation's safe deposit box and the other was used by Dawkins to open a personal checking account; three, totaling $23,010.66, were endorsed by Dawkins and deposited in his personal bank account, and the remaining check, amounting to $5,662.80, was endorsed by Dawkins and delivered to an individual as a loan. Dawkins did not issue any note or pledge any security to the corporation for the unreported sales withheld by him and was never charged, indicted, or convicted of embezzlement. The corporation did not formally declare any dividends during the taxable years and its books reflect no distributions out of capital. The *161 personal account of Dawkins on the corporation's books reflects various debits and credits, including amounts for salary, travel expense allowances, cash withdrawals, and personal expenses, during the taxable years. The account had a credit balance of $9,737.68 on January 1, 1942, and $17,741.04, $22,677.39, $57,797.61, $67,797.66, and $65,303.63 at the close of 1942, 1943, 1944, 1945, and 1946, respectively. The balances included credits made at the close of 1942, 1943, and 1944 for $12,000 for salary, and $15,000 at the close of each of the years 1945 and 1946 for salary. The amount so credited each year was returned by Dawkins as income earned in the year of credit. There were no entries in the account for the proceeds of sales withheld by Dawkins. The personal account of Dawkins on the corporate books was charged with $150,000 on December 31, 1947, with a balancing credit to surplus. The original income tax returns of the corporation were prepared by a certified public accountant on the basis of the books and records of the corporation without an audit. During the years 1944, 1945, and 1946, Dawkins had a book which, if properly kept, was sufficient for an individual taxpayer *162 to correctly report income on the cash basis. No data was retained by Dawkins to support entries made in the book. The book contained some capital items as expenses and did not include some sales of peaches, or any record of travel expenses. At the end of each year Dawkins' daughter, Madeline, prepared a statement of income and disbursements from his check stubs and deposit slips. His income tax returns for the taxable years were prepared from this data by Muren without an audit of the books. Dawkins had no records of income and expenses in 1942 and 1943 other than cancelled checks and deposit tickets. He made sales of peaches in 1944 and 1946 in the respective amounts of $3,020.85 and $201.76 which were not recorded on his books and records or reported in his returns for those years. Muren has been the accountant for Dawkins and the corporation since 1937. His accounting services for Dawkins consisted of the preparation of his personal income tax returns from data submitted by him, and his engagement by the corporation was confined to making periodic statements from its books without audit and preparation from the books, without audit, of income tax returns. He was not consulted *163 by Dawkins prior to March 1947 about the filing of an excess profits tax return for the corporation for the year 1944. Such instructions as he received for the filing of income tax returns for the corporation were given by Dawkins. He did not prepare an excess profits tax return for the corporation for 1944 for timely filing because his examination of the corporate books disclosed insufficient income to require a return under the applicable regulations. In 1931 or 1932 Dawkins purchased a home in Clayton, Missouri, for $14,000. He paid $1,000 a month for six months and gave a mortgage for the remainder. He was "hard up" during that period and paid nothing on the mortgaged indebtedness for three or four years. He eventually paid the mortgage. During 1933 and 1934 Dawkins borrowed $1,000 and $2,000 from the Fruit Exchange, Centralia, Illinois, at 6 per cent interest. In 1936 he borrowed $3,000 secured by a mortgage on his farm in Illinois. In 1937 he borrowed $2,850 on the security of three rental houses he owned in Illinois. Dawkins paid interest on all of the loans. During the 1930's he paid delinquent income taxes for five years and delinquent real estate taxes for three years. *164 The years 1931 and 1932 were bad in the milk business. Moderate business conditions prevailed thereafter to 1937. In 1935 and 1937 the corporation had net income of $2,798.93 and $4,242.88, respectively, and net losses of $1,980.97, $1,576.35, and $4,045.84 in 1936, 1937, and 1938, respectively. During the years shown the corporation credited the personal account of Dawkins with the following amounts for salary: Year
Amount
Year
Amount
1931
$ 8,000
1939
$10,000
1932
10,000
1941
3,000
1933
15,000
1942
12,000
1934
8,750
1943
12,000
1935
3,600
1944
12,000
1936
2,500
1945
15,000
1937
2,500
1946
15,000
1938
2,500 During the years 1935 to 1939, inclusive, he withdrew $10,465.25 of the salary credited to his account. The amount credited to the account during each of the taxable years for salary was reported by Dawkins as income received in the year of credit. On November 3, 1944, a complaint was filed against the corporation charging it for violations of the Emergency Price Control Act of 1942 for sales of milk in excess of O.P.A. prices. On November 6, 1944, a consent judgment was entered against the corporation in the amount *165 of $2,621.31. The overcharges alleged in the complaint were entered on the books of the corporation, and were the only ones ever made by it. In his determination of the deficiencies against the corporation the respondent increased income from sales in the amounts of $18,563.17, $45,152.11, $76,871.42, $31,737.29, and $35,763.38 in the respective taxable years. He also determined fraud penalties each year under section 293(b), Internal Revenue Code of 1939, and a penalty in 1944 under section 291(a) for failure to file a timely excess profits tax return. The earned surplus of the corporation on January 1, 1942, was $2,345.44. The respondent determined that the earnings of the corporation available at the close of the taxable years for distribution as dividends were as follows, after adjustment for accrual of Federal taxes: Available
for
Distri-
Distributed
Year
bution
Dividends
Capital
Balance
1942
$28,611.01
$18,563.17 $
$10,047.84
1943
23,806.22
23,806.22
21,345.89
None
1944
17,576.77
17,576.77
59,294.65
None
1945
15,603.46
15,603.46
16,133.83
None
1946
62,043.63
35,763.38
26,280.25
In determining the deficiencies *166 against Dawkins for the taxable years respondent increased income each year by amounts which included the following items as representing distributions to him of earnings and capital of the corporation on account of unreported sales diverted by him: Ordinary
Capital
Year
Dividends
Gain
Total
1942
$18,563.17 $ $
1943
[1] 23,806.22
[1] 21,345.89
45,152.11
1944
[2] 17,576.77
[2] 59,294.65
76,871.42
1945
[3] 15,603.46
[3] 16,133.83
31,737.29
1946
35,763.38
*167 The income tax returns filed by Dawkins and the corporation for each of the years 1942, 1943, 1944, and 1946 were false and fraudulent with intent to evade tax, and a part of the deficiency determined against the petitioners in each of those years was due to fraud with intent to evade tax. Opinion Agreement of the parties eliminates the question raised as to the amount of unreported taxable income of the corporation from sales for the years 1942, 1943, and 1946, and as a consequence limits the issue to the years 1944 and 1945. As to the year 1944, the parties agree upon the amount of $49,061.42 as representing unreported sales income verified by their investigations of accounts receivable, all of which we have found was diverted by Dawkins to his own use. The corporation contends that there were no additional unreported sales, contrary to the determination of respondent that there were sales of $27,810 in excess of the verified amount. Concerning the year 1945, the corporation contends that it had no unreported sales, and respondent insists here, as he determined, that such income was $31,737.29. The additional income in controversy in each of the years 1944 and 1945 was *168 determined by the respondent by net worth statements of assets of Dawkins. The respondent assumed that the increases in net worth were derived from additional unreported sales of the corporation, and from the inference so made, the amounts were included in taxable income of the corporation and taxed to Dawkins as ordinary dividends or long-term capital gain, depending upon the availability of earnings for distribution. The disclosure made by Dawkins warranted an exhaustive investigation by agents of the respondent, including the preparation of net worth statements to test the accuracy of the admission, for the facts developed by a net worth statement could demonstrate the unreliability of the books. Morris Lipsitz, 21 T.C. 917, affd. 220 Fed. (2d) 871. While deficiencies determined by the net worth method are prima facie correct, Frank Imburgia, 22 T.C. 1002, the statements represent an approximation of taxable income and must be carefully examined to test their reliability as a substitute for the customary method of computing income. Records maintained by Dawkins and turned over to his accountant and attorney for the preparation of amended *169 returns of the corporation disclosed diversions totaling about $132,000 during all of the taxable years except 1945, for which year he had no data. To avoid an understatement, a total of $150,000 of additional income from unrecorded sales was returned, including the estimated amount of $10,000 for 1945. The corporation's office personnel, acting under instructions given by Dawkins, promptly instituted an investigation to ascertain the extent of the diversions. The examination disclosed unrecorded sales totaling $148,540.08. The unrecorded sales for 1944 were found to agree with the total of $49,061.42 shown by the records of Dawkins. No unrecorded sales were found for 1945. The thoroughness of the corporation's inquiry is apparent from the fact that respondent's agents, who conducted their examination of the sales accounts independent of the one conducted by the corporation, were unable to uncover any more unreported sales. The audit of the respondent's agents continued as long as they considered their efforts to be profitable. Except for the Tip Top Creamery Company in 1942, there was an account on the corporate books for the customers, the proceeds of some of the sales to which *170 were diverted by Dawkins. The obvious purpose of the net worth statement was to ascertain whether there had been an increase in any year, and, if so, to determine the source of the increase. Such increase as was not accounted for was presumed to have been derived from additional unreported sales of the corporation. No amount was allocated to the farm, from the operation of which Dawkins reported gross profits of about $16,000 in 1944 and $8,800 in 1945. Respondent determined the additional income as follows: 1944
1945
Increase net worth
$150,495.55
$49,354.57
Less: Adjusted cash available
$16,751.57
17,617.28
Verified diversions
49,061.42
Increase accounted for
56,872.56
122,685.55
Increase unaccounted for
$ 27,810.00
$31,737.29
The adjustments for cash available for increased net worth are in controversy. The figures used by respondent represent an accumulation since January 1, 1940, based upon a djusted net income reported in returns, plus depreciation and depletion, less capital additions and family living expenses. Nothing was included in the computation for cash on hand on the opening date other than $59.32 for the balance in *171 a checking account. Petitioners contend that in addition to the small bank balance, Dawkins had an accumulation of from $50,000 to $60,000 of currency in a safe deposit box on January 1, 1940, and equally as much as late as 1942, when the corporate box was opened and he started to use it. Dawkins testified that he had accumulated about $50,000 in currency by 1928 from sales of certain specified plants and other sources, and that probably $10,000 to $12,000 of the accumulation was in the corporate box in 1947 when he removed the contents and delivered the proceeds to the corporation for deposit to its credit. The testimony on the maintenance of a large reserve of currency is corroborated by testimony of the president of the Ashley State Bank that he frequently saw Dawkins place "bulky" packages of currency in the box at that bank, and the facts show that he had about $25,000 of cash in the corporate box in St. Louis in March 1947. While we can not accept the evidence offered by petitioners as proof of any specified amount of accumulated currency on January 1, 1940, in the deposit box, it does establish that some estimated amount should have been allowed by the respondent. To that *172 extent his net worth statement is unreliable. It has other weaknesses. The statement each year includes an increase in the credit balance of Dawkins' personal account on the books of the corporation, $35,120.22 in 1944 and $20,000.05 in 1945. The effect of such action is that the amounts were constructively received by him. Dawkins returned each taxable year the salary credited to his account, for which respondent made adjustments in his computation of income returned for taxation, but he did not apply the constructive receipt theory to increases in the account for years for which he did not apply the net worth method of reconstructing income. The corporation had about $1,900 of cash on hand at the close of 1944 and about $31,000 on December 31, 1945. Payment of the obligation to Dawkins in 1944 obviously would have required a financial transaction of some sort to obtain additional funds, which operates against the application of the theory. Moreover, the increase in 1945 is otherwise erroneous in that it is based upon a balance of $77,796.66 in the personal account at the close of the year, an amount $10,000 in excess of the actual liability. The matters discussed and other evidence *173 in the record demonstrate that the net worth statement is not sufficiently reliable to accept as a basis for sustaining the respondent's determination. Accordingly, we hold that respondent erred in increasing the corporation's taxable income for unreported sales by the amounts of $27,810 in 1944 and $31,737.29 in 1945 by the net worth method and taxing such amounts to Dawkins as distributions of the corporation. As already pointed out, the corporation is not contesting the inclusion in its income of the agreed amounts diverted by Dawkins in 1942, 1943, 1944, and 1946, totaling $148,540.08. [1] Dawkins contends that the amounts he received constituted payment of indebtedness of the corporation to him, and, therefore, [are] not subject to tax. The argument has no merit. The credit balance in the personal account of Dawkins increased only about $55,500 during the taxable years, including two credits, totaling $15,138.60, for diverted money he caused to be credited to the account, and as a result *174 the indebtedness could have offset only a portion of the diversions. Dawkins, absent evidence to the contrary, must be charged with knowledge of the balances to his credit on the corporate books, and, therefore, knew that they were less at the close of each year than the amounts withheld, even according to the records he maintained of his diversions. Lack of any notion on his part that he regarded the diversions as payment of indebtedness to him is shown by the credits he had the corporation make to the account while retaining the money for his own use. That he withheld the money under a claim of right for personal use is borne out by an admission that a substantial part of it was used to make investments in his own name. In response to a question by special agents whether the purpose of the diversions was "specifically to save taxes in order to build up a surplus," he testified, as recorded in a statement under his signature, "That's right." Dawkins testified before us that he decided in 1947 to make a disclosure of his diversions because he "was getting in bad health" and "figured the money belonged to the Government." Such evidence is opposed to the idea that he ever entertained *175 a notion that the money be withheld was in payment of a corporate debt to him or that he was merely taking his own money. To the contrary, his intent was to take the unrecorded income as distributions from the corporation. See Ace Tool & Eng., Inc., 22 T.C. 833; United Mercantile Agencies, Incorporated, 23 T.C. 1105 (Mar. 31, 1955) We thus find no error in respondent's treatment of the diversions as corporate distributions. But Dawkins asserts that he owned no more than 3 per cent of the corporation's outstanding stock. The other shares were issued in the names of members of his family, 95 to his wife, and one each to a son and daughter. Actual ownership of the stock is a question of fact. The evidence here overwhelmingly supports the finding of respondent that Dawkins was at all times throughout the taxable years the actual owner of all of the stock of the corporation. The respondent taxed the distributions to Dawkins as ordinary dividends to the extent of available earnings, after adjustments for accrued income and excess profits taxes, and the excess as a return of capital, taxable as long-term capital gain. Such treatment of the distributions was proper. *176 The Shield Company, Inc., 2 T.C. 763; George M. Gross, 23 T.C. 756. The source of the distributions will be recomputed under Rule 50 to reflect adjustments made necessary by our conclusions here. Respondent's imposition of the fraud penalties is based upon the failure of the corporation and Dawkins to include in their returns the amounts diverted by the individual. The corporation relies upon United Dressed Beef Co., 23 T.C. 879, (Feb. 18, 1955), as conclusive on the issue applicable to it, while Dawkins asserts, on grounds already discussed, that he received no taxable income from the diverted funds; hence had no unreported income. Proof of lack of unreported sales and diversions by Dawkins in 1945 completely answers the imposition of the fraud penalties in that year. The respondent, however, fully sustained his burden of proof as to the other years. The evidence need not be discussed in detail. It is sufficient to say that it discloses, without doubt, a deliberate purpose of Dawkins to conceal corporate sales, and distributions on his stock, with intent to evade income taxes. He knew when signing his and the corporation's returns that they *177 did not include for taxation the amounts diverted to his own use. The fact that dividends were not formally declared is immaterial. Bennett E. Meyers, 21 T.C. 331. The corporation's fraud was not cured by the filing of amended returns to include income not reported in the original returns. George M. Still, Inc., 19 T.C. 1072, affd. 218 Fed. (2d) 639. United Dressed Beef Co., supra, involved a distinguishable fact. There the corporation acted upon competent legal advice for some of the years and for the other years the Commissioner made no proof that the responsible officers of the corporation believed that the collections were taxable to the corporation. Here, Dawkins, the actual owner of all of the corporation's stock, and the officer in complete charge of its activities, was aware at all times that the amounts diverted by him constituted taxable income of the corporation. Accordingly, we conclude that a part of the deficiency asserted against each petitioner for the years 1942, 1943, 1944, and 1946 was due to fraud with intent to evade tax. The corporation relied upon Muren to prepare its excess profits tax returns. He *178 did not prepare such a return for 1944 because the corporate books did not reflect sufficient income to require filing one. In March 1947, when he was advised by Dawkins of the unrecorded taxable income, Muren promptly prepared, and the corporation filed, an excess profits tax return for 1944. The corporation relies upon these circumstances as reasonable cause for failure to file the return. It is apparent that the accountant acted without full knowledge of the actual facts, which were concealed by Dawkins to evade taxes. The actual reason for the failure to file a timely return is the direct opposite of reasonable cause. Clearly, respondent committed no error in imposing the penalty. The remaining issue relates to excess profits tax credits. The corporation concedes that it is entitled to no more than the amounts allowed after adjustments made necessary by our conclusions on the other issues. Accordingly, the amounts will be recomputed under Rule 50. Decisions will be entered under Rule 50. Footnotes
1. Of the verified unreported sales of $45,152.11, the amount of $23,806.22 was held to be a dividend paid out of net earnings and the remainder of $21,345.89 was held to be a capital distribution, taxable as long-term gain. After deducting cost of $5,099.19 from the capital distribution, one-half of the remainder, or $8,123.35, was included in taxable income. ↩
2. The parties agree upon unreported sales to the extent of $49,061.42. The additional amount of $27,810 to make up the total of $76,871.42 was determined as an unaccounted for increase in Dawkins' net worth. The amount of $27,810 so determined was regarded as sales of the corporation diverted by Dawkins, in addition to the verified diversions of $49,061.42. Of the total distributions of $76,871.42, the amount of $17,576.77 was treated as an ordinary dividend, paid out of net earnings, and the remainder as a capital distribution, one-half, or $29,647.33, subject to tax. ↩
3. Of the agreed unreported sales of $31,737.29 of the corporation, respondent held that $15,603.46 was received by Dawkins as dividends paid out of earnings and the remainder out of capital, one-half taxable as long-term capital gain.↩
1. The conclusion just reached eliminated from taxation to both petitioners the amount of $27,810 in excess of the agreed figure for 1944 and all of the amount of $31,737.29 in 1945.↩