Alice V. Prokop v. Commissioner. Harry W. Prokop and Alice V. Prokop, his wife, v. Commissioner.
Prokop v. Commissioner
Docket Nos. 49495, 49496.
United States Tax Court
T.C. Memo 1957-75; 1957 Tax Ct. Memo LEXIS 176; 16 T.C.M. (CCH) 313; T.C.M. (RIA) 57075; May 13, 1957
*176 During the years 1944 through 1947, inclusive, petitioner Alice V. Prokop, while employed by a local labor union in Milwaukee as bookkeeper and personal secretary to Edward J. Brown, executive business manager of the local union, (and its International president) collected substantial amounts of "permit fees" from provisional permit workers for the privilege of working in its local jurisdiction. Petitioner, in collusion with Brown, failed to record on the books of the Union or deposit in the Union's bank accounts a very large part of such permit fees. In 1947, after an audit was begun with attention directed to the question of permit fees, Alice paid to the Union a total of $36,000, and the Union released her from any further liability. The Union did not accuse petitioner (or Brown) of embezzlement, or prosecute either of them. Respondent concedes that, as a result of the $36,000 payment by Alice in 1947, there was no unreported income in that year. Held: 1. That with respect to the deficiencies determined for the years 1944, 1945 and 1946, petitioner has failed to meet the burden of establishing error on the part of respondent except to the extent set forth in our Opinion. Commissioner v. Wilcox, 327 U.S. 404 (1946) *177 distinguished. 2. That respondent failed to sustain his burden of proof with respect to increased deficiencies and increased additions to tax asserted in his amended answers. 3. That part of the deficiencies in each of the taxable years, 1944, 1945 and 1946, was due to fraud with intent to evade taxes. 4. That any additions to tax under section 294(d) of the Internal Revenue Code of 1939 will be determined under Rule 50. Chester J. Niebler, Esq., Marshall J. Herro, Esq., for the petitioners. Thomas J. Donnelly, Jr., Esq., J. Bruce Donaldson, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: This consolidated proceeding involves deficiencies in income tax and additions to tax determined *178 against petitioners as follows: Sec. 293(b)
Sec. 294(d)
Addition
Addition
Year
Deficiency
to Tax
to Tax
1944
$25,290.32
$12,645.16
$1,510.35
1945
25,868.45
12,934.23
4,143.10
1946
19,424.18
9,712.09
3,127.39
1947
411.55
205.78
74.56
Respondent, on October 5, 1955, by amended answer, under the provisions of section 272 (e), Internal Revenue Code of 1939, claimed increased deficiencies in income taxes and additions to tax as follows: Sec. 293(b)
Sec. 294(d)
Addition
Addition
Year
Income Tax
to Tax
to Tax
1947
$60,472.87
$30,311.19
$9,699.60
Respondent, on May 10, 1956, by amended answer for the year 1944, and by an amendment to answer, as amended, for the years 1945 and 1946, claimed increased deficiencies in income tax and additions to tax for the years 1944 to 1946, inclusive. Also, respondent, by further amendment to his amended answer, filed the same date, asserted an alternative claim of increased deficiencies with respect to the taxable year 1947, in the event this Court sustains his alternative position hereinafter discussed. The increased deficiencies and additions to tax claimed *179 are as follows: Sec. 293(b)
Sec. 294(d)
Addition
Addition
Year
Income Tax
to Tax
to Tax
1944
$ 9,360.25
$ 4,680.13
$ 561.61
1945
9,368.22
4,684.11
1,146.27
1946
8,328.08
4,164.04
1,053.76
1947
37,164.57
18,507.53
4,941.37
In addition, respondent has asserted a series of alternative claims for increased deficiencies and additions to tax as follows: * * *
"2. In the alternative, that the deficiency in tax as set forth in the notice of deficiency for the taxable year 1947 and the deficiency in penalty pursuant to the provisions of section 294(d) of the Internal Revenue Code of 1939 as set forth in the notice of deficiency as increased by an additional deficiency in tax in the amount of $97,637.44 and an additional deficiency in penalty pursuant to the provisions of section 294(d) of the Internal Revenue Code of 1939 in the amount of $14,640.97 be approved in all respects, in the event that the deficiencies in tax and penalties are not determined to be due from the petitioner for the taxable years 1944, 1945 and 1946. "3. That the deficiencies in fraud penalty as set forth in the notice of deficiency for the taxable years *180 1945 and 1946, as increased by an additional deficiency in fraud penalty in the amount of $4,684.11 for the taxable year 1945, and $4,164.04 for the taxable year 1946, be in all respects approved. "4. In the alternative, that the deficiency in fraud penalty as set forth in the notice of deficiency for the taxable year 1947 as increased by an additional deficiency in fraud penalty in the amount of $48,818.72 for the taxable year 1947 be approved in all respects, in the event it is determined that there is no deficiency in tax and penalty for the petitioner for the taxable years 1944, 1945 and 1946." Respondent, on brief, conceded that petitioner is entitled to a deduction for the taxable year 1947 in the amount of $36,000 by reason of her repayment of such sum to the Union in consideration of the release and discharge given to her in that year. Other than the foregoing, issues presented for our consideration are: (1) whether Harry W. and Alice V. Prokop for the taxable year 1944, and Alice V. Prokop for the taxable years 1945, 1946 and 1947, realized taxable income during each of such years from amounts collected from temporary permit workers of the Union, as permit fees, which *181 they failed to report for tax purposes and, if so, in what amounts; (2) whether, in the alternative, assuming that the amounts referred to in (1) above are not taxable as income in the year of their receipt, such amounts are taxable to Alice V. Prokop in the taxable year 1947, the year in which she received a release and discharge from the Union of any obligation to repay such amounts, to the extent that such amounts exceed the $36,000 given by her in consideration for such release; (3) whether any part of the deficiency for each of the years in question is due to fraud with intent to evade tax; and (4) whether additions to tax under section 294(d) of the Internal Revenue Code of 1939 are applicable to Alice and her husband for the taxable year 1944, and to Alice V. Prokop for the years 1945, 1946 and 1947. Findings of Fact The facts are partly stipulated and to the extent so stipulated are incorporated herein by reference. Petitioners, Alice V. and Harry W. Prokop, are wife and husband, and during the years 1944 through 1947, inclusive, resided in Milwaukee, Wisconsin. Petitioners filed joint income tax returns for the year 1944 and separate returns for the years 1945 through *182 1947, inclusive. These returns were filed with the then collector of internal revenue for the district of Milwaukee, Wisconsin. Background and General Facts Petitioners were married on August 2, 1932, and are childless. Prior to marriage and during coverture, both have been continuously and gainfully employed. Harry W. Prokop, for about 25 years, has been a social worker in the welfare department of Milwaukee County. His wife, Alice, nee Slizewski, hereinafter sometimes called petitioner, was born April 28, 1907, in Milwaukee. She there attended St. John's parochial school and, after skipping two grades, graduated at the age of about thirteen. Thereafter, she attended the Milwaukee Business Institute, a business college, for about one year. She then worked as a saleslady and office employee in an electrical appliance store. On October 1, 1930, Alice was hired by Local 494 of the International Brotherhood of Electrical Workers, American Federation of Labor, hereinafter referred to as Union, where she performed general office work and also served as secretary to Edward J. Brown during his tenure as business manager of the Union. Alice worked for the Union for about 17 years, i. *183 e., until September 25, 1947, when she was discharged from her position of trust following an audit of Union funds. Brown's position was the highest office in the local union. In the early part of 1940, he was appointed president of the International Brotherhood of Electrical Workers, (hereinafter referred to as International) the parent organization of the local union, with headquarters in Washington, D.C. In 1942 he was elected president of the International, holding that position until December 31, 1946. During the four years Brown was stationed in Washington as International president, he did not resign his position as business manager of the local union. At least once a month Brown would return to Milwaukee to supervise the affairs of the local union. In September 1946, Brown was defeated for reelection as International president, and in 1947, he reverted to executive business manager of the Milwaukee local union. In September 1947, the Union charged Brown with acquiring an operating interest in an electrical contracting organization in Milwaukee, known as Electric Sales and Engineering Company, contrary to the constitution of the Union, and discharged him from its organization. *184 He died in Washington, D.C., on January 31, 1950. Role of Alice V. Prokop in Union Affairs During the four years Brown had been headquartered in Washington as International president, he had delegated much of his authority to Alice, who, as his personal secretary, had virtually grown up with the Union over the years. The lesser officials in the organization knew that they were still responsible to Brown through her. Purportedly acting upon authority from Brown during his extended absences, Alice exercised considerable control and influence over Union affairs and directed many of its activities in addition to performing routine duties. Fransway had been appointed business representative of the Union in 1940 by Brown, who was then business manager, and for a short time thereafter he worked in Brown's office. While Brown handled his Washington assignment, he appointed Fransway to be acting business manager of the Union. The business manager is in full charge of the Union and actually runs its affairs subject to the executive board. Business representatives work under the immediate supervision of the business manager, assisting in the negotiation of labor contracts and checking *185 union jobs to determine whether the contractor (employer) has hired union employees. During the years 1944 to 1947, inclusive, George Albrecht was the Union treasurer and among his assignments, it was his duty to sign all checks, vouchers, render a financial report to the auditor, and handle the finances of the Union. However, during these years, Alice with the knowledge of the executive board, customarily signed the name of the Union treasurer to vouchers authorizing payments out of the Union funds. Likewise, during said period Alice had access to the safe located in the office of the Union, and was customarily the person who would open it and withdraw funds from it. She also had access to two of the three safety deposit boxes used by the Union, two of which were located in the First Wisconsin National Bank and the third located in the State Bank of Milwaukee. During the years 1944 to 1947, inclusive, Alice was in charge of collecting "permit fees" from temporary permit workers. Amounts collected by the other girls in the office from permit workers were turned over to Alice and accounted for to her. During said period Alice was also in charge of the collection of delinquent *186 accounts of temporary permit workers. This activity was usually accomplished through the assistance of the office girls who helped in the collection of such accounts under her immediate supervision. On occasions when permit workers were late in their permit fee payment, petitioner would cause their removal from the Union, and sometimes would allow them to return to the Union after payment of a fee. On one occasion, in 1946, Alice requested a "Christmas present" in the amount of $100 from an electrical contractor employing workers belonging to the Union. When the contractor failed to comply with her request, he received little cooperation thereafter from Alice or from the Union in securing additional Union employees for his job sites. Permit Fee Collection Procedure During the taxable years in question the Union collected "permit fees" from nonregular card-holders within its jurisdiction who had not been qualified for regular union membership, such permit fees being charged for the privilege of working for those electrical contractors who employed only Union members or permit holders. It was the function of the executive board of the Union on the recommendation of Brown to *187 set the policy on the collection of said permit fees. During the years 1940 through 1947 (except for about six months during 1943 when the collection was temporarily discontinued following an investigation of the Union's activities by the Federal Bureau of Investigation) permit fees were collected from non-card members in varying amounts, depending on their classification and the prevailing fee in effect. Thus, during each year involved herein, approximately 50 to 60 electricians who were "non-local members" of the Union, because they transferred from another sister local, paid permit fees to the Milwaukee Union computed on the difference between their local dues and that of the Union. The fees paid by this type of provisional worker were recorded on the Union's books. Another type of permit fee was that charged non-electricians (truck drivers, stockboys and mechanics) working in the electrical trade. There were not in excess of 40 of such workers each month and they were either charged $1.50 per month on a flat rate basis or two per cent of their gross earnings. The largest group of non-card holders during the years 1944 through 1947, inclusive, were apprentices in the local area *188 who were not regular members of the Union. During the year 1944, the latter type of permit fee members paid their fees on a percentage basis and were charged 4 per cent of their total gross earnings shown on their pay stubs. For not more than a year in the 1945-1946 period, the basis was reduced to 2 per cent. Thereafter, and in 1947, the charge was again 4 per cent. Each month during the period January 1, 1944, to September 25, 1947, (when Alice was discharged) permit fees were collected from non-card holding members of the Union by petitioner with the assistance of Evelyn Sadowski, and there were at least 400 workers and possibly as many as 500 at times paying such fees. There were 474 individual persons listed as paying permit fees during the months of August and September 1947. The average wage of a permit worker upon which his percentage fee was based was $90 to $100 per week during the period January 1, 1944, to September 25, 1947. In order to insure that permit workers paid their fee when it was due, each of the electrical contractors employing men from the Union submitted a monthly payroll report reflecting the individuals employed by them, and the amount earned by each *189 worker. By reference to this list, Alice could ascertain who was working on permit, how much that individual earned, and then determine if he had paid his permit fee. If the name of a permit worker appeared on these employer reports, but was not shown to have paid his fee, the name would be placed on a delinquent list. Two delinquent notices were sent to the individual, usually by petitioner's assistant, Evelyn Sadowski, (now Evelyn Rider) and if the delinquent did not respond, his name would be turned over to Alice, who would contact the employer concerning the matter. When the permit member finally paid, his name would be scratched off the delinquent list. Each month during the years involved herein there were an indeterminate number of such delinquent members whose names had not been removed from the list. Fees were collected and permits issued on a monthly basis. When a permit member was due to pay his fee, usually he or his wife would come to the Union office with his paycheck stub and present it to petitioner or to Evelyn Sadowski. Either individual collecting the fee would total the gross earnings shown on the paycheck stubs, compute the prevailing percentage charge thereof *190 (or flat rate basis for non-electricians) and collect the resultant amount as the permit fee. The permit member was then given a receipt for the charge, and the amount paid and the date of payment were noted on the back of a 3 X 5 card on which a record of such collection was kept in the Union office. Of the payments made on permit workers' fees, approximately 80 per cent were made in cash. The balance of said payments were made either by money order or by the individual cashing a paycheck at the Union offices. In those instances where checks were cashed at the time of the collection of permit fees, the check would be endorsed in blank by the permit member, and on some occasions these checks were cashed at the State Bank of Milwaukee by Alice. During the years in question, Evelyn was accountable to Alice for all fees collected from such provisional workers. Amounts collected by Evelyn were placed by her in a cash box in her desk drawer. On the average of approximately once a week Evelyn would balance the amounts in her money box with Alice and turn over to her the amounts collected. Alice would check the amounts shown on the receipts which were duplicates of the ones issued by *191 Evelyn. Depending on the number of permit workers employed and the time lapse between the balancing of such collections, these amounts usually ranged from $500 to $1,000 at each accounting. During the week Alice would also take money from Evelyn's cash box, giving her a memorandum receipt therefor known as an "I.O.U." slip. Amounts turned over to petitioner in these supplemental transactions during the week averaged about $100 on each occasion. Amounts collected personally by Alice from permit members were temporarily placed in a drawer in her desk, or in the office safe to which she had free access. During the years 1944 to 1947, inclusive, petitioner maintained a safety deposit box in her own name only in the State Bank of Milwaukee, (now known as the Bank of Commerce) wherein she kept her own property and money. Part of the amounts collected from permit workers as permit fees was deposited with other Union funds and recorded on the books and records of the Union. The fees which were not recorded on the Union books were kept by Alice in her personal safety deposit box at the State Bank of Milwaukee. No one in the office interfered with the aforesaid collections and no one connected *192 with the Union, other than Alice, knew exactly how much was being collected from permit workers. Alice had the authority to handle the permit fees and to record them on the Union books. Each year the Union auditor, William J. Schulke (now deceased) examined the books and records of the Union maintained by petitioner, but the permit fee collections were not verified in his so-called audit. In June of 1947, Fransway, acting business manager, became concerned about the permit fee fund and after consulting auditor Schulke as to the number of permit fee workers registered with the Union, was informed by Schulke that the Union records presented to him each year did not include data as to permit fee collections. Fransway thereupon consulted Schroeder, the then president of the Union, about the incomplete audit of Union assets and upon the advice of the Union's attorneys, it was decided to have an audit of all Union funds conducted by Maurice Ritz, a certified public accountant. Counsel for the Union advised Fransway, who was quite friendly with petitioner and Brown, that he should not disclose the purpose of the audit to them. On September 9, 1947, when Ritz began to conduct his audit *193 of the collections made from permit workers, there were no records made available to him by petitioner from which the total amount of such collections could be determined. Since the permit fee records had been removed from the Union office or destroyed prior to or at the time of the audit (to be discussed infra), it was necessary for Ritz to reconstruct the amounts collected by petitioner from provisional permit workers. For the year 1947, he was able to redetermine the amounts paid as wages to such workers from duplicate records procured from contractors and to compute the percentage fee then in effect thereon to arrive at the amount paid by such temporary permit workers during that period. Using said method of reconstruction, Ritz ascertained that during the period January 1 to September 26, 1947, a total $31,626.94 was paid as permit workers' fees of the Union. No such detailed and exhaustive audit was made for the years 1944, 1945 and 1946 because of the nonavailability of contractors' wage payment records for those years. For these latter years it was necessary to reconstruct the minimum amounts collected from non-card holding employees each year by a computation based on the *194 estimated number of permit workers, their estimated average wages, and the percentage charged as fees. Some of the amounts collected from permit workers of the Union were recorded on the books and records of the Union. However, there were no amounts on the books and records recorded as "permit fees" as such. Those permit fees which were recorded on the books were entered under "Miscellaneous Income." Amounts considered to be recorded on the books of account as permit fee income for the years 1944 to 1947, inclusive, were calculated by arriving at a figure which included all the regular sources of income, such as the proper amount of regular member dues and assessments, initiation fees, and other regular sources of income, and considering the excess over such amount to represent amounts collected from permit workers as permit fees to the extent that such amounts were recorded on the books and records of the Union. On the basis of the foregoing methods of allocation by the auditors, the parties have stipulated that, of the amounts collected as fees from permit workers during each of the taxable years 1944, 1945, 1946 and for the period January 1 to September 26, 1947, there was included *195 with the other Union funds on the statements and accounts of the Union, and reflected on the balance sheets and operating statements of the Union, only the following amounts: Year
Amount
1944
$ 9,479.84
1945
7,326.07
1946
13,588.32
Jan. 1, 1947 to Sept. 26, 1947
22,485.60
Total
$52,879.83
Falsification and Destruction of Permit Fee Collection Records of the Union On September 8, or 9, 1947, Ritz, after accepting the engagement to conduct an audit of the Union's books and records, visited Alice in her office at the Union. On that occasion she indicated that there was no need for an audit since one had just been made, and did not make the books and records of the Union available to him at that time. Also, Alice told Ritz she was not able to work with him at that time, and advised him to come back a day or two later. Ritz returned and proceeded with his audit on September 12, 1947. That day at about 10:00 a.m. in the Union office, petitioner requested Fransway to drive her out to Brown's farm on the latter's orders. Before leaving the Union office, petitioner placed certain contractors' payroll records in a grip or suit case. Such records consisted of *196 8 X 10 mimeographed sheets on which the electrical contractors had written in the names of employees they had hired, designating the number of hours they had worked, and the wages of all of their employees. The amount of the permit fees to be collected from the workers could be determined from these records. Fransway made no effort to prevent petitioner from taking the payroll records, having been advised by Union counsel and by detective Frank Doyle of the Milwaukee police department who had been brought into the investigation by Fransway, not to divulge his position in the audit of permit fee collections. Fransway drove petitioner to the Brown farm with the grip containing said records, and when they arrived at the farm, petitioner removed the grip from the automobile and remained, while Fransway turned around and returned to the Union offices, arriving there about 12:00 noon. About 12:30 p.m. on that day Fransway had lunch with Walter Gerke, another business representative of the Union, at which time Alice had not as yet returned from the Brown farm, and at that time Fransway told Gerke of the taking of the Union records to the Brown farm. At approximately 2:00 p.m. Alice and *197 Brown returned to the Union office from the farm. At that time Brown stated in the presence of Fransway: "That is the end of that. I got oil on my trousers burning it." (Whether or not the payroll records were burned, they were never produced.) Fransway reported the foregoing incident to the other Union officers and to Ritz. Since the payroll records mentioned above were never made available for examination by Ritz, he later reconstructed them, from what information he could gather, in an effort to ascertain the amounts collected from temporary permit workers by petitioner. Amounts collected from temporary permit workers of the Union during the years 1944 to 1947 could also have been determined from certain 3 X 5 cards, by reference to the amounts collected noted on the back side of such card. These cards were maintained by Alice in the Union office for the purpose of determining the workers who had paid their fees and those who had not. Soon after Ritz began his audit of the Union's books and records, Alice took these 3 X 5 cards to her home, and requested Evelyn to visit her home for the purpose of retyping the cards. Thereafter, Evelyn came to petitioner's residence on a Sunday *198 and at Alice's direction retyped certain information contained on the 3 X 5 cards on new cards. The information typed on the new cards included the name and address of the worker, his date of birth and telephone number, but excluded from the back of such card the dates of payment and amount paid as permit fee. These new cards were then rubbed on the carpet in her home by petitioner for the purpose of making them look used, and then they were placed on a window sill in her home to make them look older. The new retyped cards were thereafter placed in the Union offices by Alice in place of the old cards containing the payment information. The old cards containing such payment information were not made available to Ritz while he was conducting his examination or at any time thereafter. After Evelyn had retyped the 3 X 5 cards at the home of petitioner, she did not return to her position at the Union office. Instead, another job was secured for her by petitioner and Brown, at the Milwaukee office of the United Steel Workers of America, C.I.O. Evelyn worked there for about three weeks and then returned to the offices of the Union, where she is presently employed. When Evelyn returned to *199 the Union office, the new 3 X 5 cards were there but the old ones were missing. During the course of the examination of the Union's books and records by Ritz, petitioner instructed Evelyn, her assistant in the office, not to answer any questions at all which might be put to her by the auditors. Petitioner's Endorsement of the Howard Wilke Checks In September of 1946, the International mailed a check to the Union payable to Howard Wilke, an attorney, in the amount of $4,955.12 for legal services rendered on behalf of the Union. Petitioner endorsed Wilke's name to the check and cashed it. She does not claim she had authority from him to do so. On December 13, 1946, petitioner, using the names of the International and the local Union as the respective purchasers, obtained two money orders payable to Wilke in the total amount of $2,498.72, representing the aggregate of three bills he had previously submitted to the Union. It was not the practice of the Union to pay bills involving substantial amounts by money orders. Petitioner was in charge of keeping the records of the Union's income and disbursements. The records of the Union are to the effect that Wilke had been paid the full *200 amount of the International's check in the amount of $4,955.12 When Wilke was contacted by Ritz during the audit of Union funds, Wilke stated that he never received the International check in the amount of $4,955.12 payable to him, and petitioner did not claim that he received the check or the proceeds thereof. On December 19, 1946, a check was issued by the Union signed by the treasurer and president, payable to Harold Wilke for legal services in the amount of $1,373.20; and on June 5, 1947, another was made payable to him in the sum of $300. Petitioner recorded the payment of the two checks to Wilke on the above dates in the cash receipts and disbursements book of the Union. Both checks purport to bear the endorsement of Wilke, but were actually endorsed by petitioner. These two checks were paid by the State Bank of Milwaukee on which they were drawn and where petitioner maintained a bank account. When contacted by Ritz during the audit of Union funds, Wilke stated that he did not receive any of the above checks. Petitioner does not claim otherwise. Disposition of Union Funds Other Than Permit Fee Receipts On September 19, 1947, a week before Alice was discharged by the Union, *201 she turned over to George Albrecht or other officers of the Union certain of the Union funds then in her possession, including $5,920.93 cash representing part of the Union General Fund deposited in a safety deposit box; [1] $55,000 face value United States Bonds (redemption value as of September 30, 1947 - $46,424.50) representing part of the General Fund deposited in a safety deposit box; $1,951.80 in cash in another safety deposit box representing part of the Union Unemployment Fund; and $12,000 face value United States Bonds (value as of September 30, 1947 - $10,070) located in a safety deposit box and representing part of the Union Unemployment Fund. These assets constituted all of the known assets of the Union as of September 30, 1947, with the exception of furniture and fixtures, and bank checking and savings accounts. All United States Bonds shown as part of the General Fund and Unemployment Fund were purchased prior to 1944. United States Bonds were not purchased by the Union and included as a part of these funds during the years 1944 to 1947, inclusive, but after 1947 the Union again began to purchase such bonds. *202 None of the amounts turned over by Alice to Albrecht or other officers of the Union in September of 1947 represented collections from temporary permit workers' fees not recorded on the Union books. Release and Discharge of Petitioner by the Union After petitioner and Brown were discharged from their employment with the Union in September of 1947, Ritz informed the Union officials that there was a greater amount of unrecorded receipts missing from the Union's treasury than he originally suspected. The officials decided to attempt to get the funds back from petitioner and Brown. Thereupon, they arranged a meeting at the Schroeder Hotel with petitioner and Brown to discuss the Union's finances. The meeting was attended by Brown, Fransway, detective Doyle, Schroeder, Charles Stenger and Alice. At that meeting the officials did not state that a definite amount of money had been diverted from their fund, but indicated that an approximate amount of $65,000 had been improperly appropriated by "someone" in charge of the funds. The Union officials demanded the return of the missing money from Alice and Brown, stating that they were "responsible" for it and that they would have to make *203 restitution. Neither Alice nor Brown raised any objection to said amount. Following the conference at the Schroeder Hotel, on October 31, 1947, Ritz informed Brown that tentative figures of the audit which he was then conducting indicated that for the period January 1 to September 26, 1947, possibly $10,407 had not been accounted for on the books of the Union. On that day, Alice delivered $10,407 in cash to Ritz from an undisclosed depository. The same day, Alice made an entry into a safety deposit box (number 1763) at the State Bank of Milwaukee, in which she kept her personal funds and papers. The sum of $10,407 received from petitioner on October 31, 1947, was deposited by Ritz in the Union's checking account at the State Bank of Milwaukee. Several weeks after Alice delivered the $10,407 to Ritz, his audit, which was still in progress, disclosed that approximately $70,000 was missing from the Union treasury, rather than the original sum suggested by him. On November 3, 1947, Alice met with certain officers of the Union at the Wisconsin Hotel, Milwaukee, Wisconsin, for the purpose of determining the amount of such money to be refunded to the Union by the individual or individuals *204 responsible for the diversion. Brown was not present at this meeting. At Brown's request, detective Doyle was present as a representative of the Milwaukee police department. During the negotiations which took place at the meeting, the officials discussed the refunding of approximately $70,000. Alice entered into the general discussion. Doyle suggested that there be a settlement of 50 cents on the dollar. Fransway and Schroeder, on the other hand, insisted that at least $40,000 of the missing funds be returned. Ritz suggested that $40,000 would be a "reasonable amount" and probably one that could be collected in a court action. Eventually, the Union officials agreed that Alice should produce the total amount of $36,000, less the $10,407 already returned. No deadline was set for the restitution of the shortage. However, Alice informed the officials that she would endeavor to have the money for them by the next morning. It was then agreed that the balance of the money ($25,593) was to be turned over to the Union's representative at the First Wisconsin National Bank. Petitioner was never charged or prosecuted for embezzlement. Between the conference at the Schroeder and Wisconsin hotels, *205 Brown took detective Doyle to see petitioner about the missing funds. Doyle was then acting as liaison between the Union and petitioner. During this visit, petitioner, when questioned about the shortage, would neither admit nor deny diverting the funds. She denied having the funds in her possession at that time. Petitioner was very despondent and spoke of committing suicide. (During 1950, when her Federal tax returns were being audited, she was hospitalized for a nervous breakdown.) On November 4, 1947, the day after the meeting at the Wisconsin Hotel, Alice withdrew the amount of $4,400 from her savings account with the State Bank of Milwaukee and the sum of $1,375 from another savings account maintained by her at the State Bank of Milwaukee. She purchased a cashier's check on her savings account with the Mitchell Street State Bank in the amount of $4,600. The cashier's check was cashed the same day at the First Wisconsin National Bank, where she was to turn the missing funds over to the Union officials. The foregoing withdrawals from her bank accounts totaled $10,375. On the morning of November 4, 1947, Alice met with detective Doyle who, at Brown's request, was to accompany *206 her to the First Wisconsin National Bank where the balance of the $36,000 was to be turned over to the Union representatives in consideration of a written release, to be discussed infra. When Alice arrived at the bank, she cashed an undisclosed amount of her United States bonds. She then proceeded to a meeting room in the bank where she turned over $25,593 in cash to the Union officials then present. Fransway, Schroeder and Stenger represented the Union at this meeting. With the exception of Doyle and a representative of the bank, these were the only individuals present at the meeting. In consideration of the $25,593 in cash turned over to the Union on November 4, 1947, by petitioner, and the $10,407 previously turned back to the Union by her on October 31, 1947, the Union, acting through Charles Stenger, the chairman of its executive board, and Arthur Schroeder, its president, executed a "Release" relieving petitioner from making any further payments to the Union, and delivered such release to her. The release, in pertinent part, stated that "Local #494, International Brotherhood of Electric Workers (A.F.L.) for and in consideration of the sum of Thirty Six Thousand Dollars * *207 * * paid by Alice Prokop * * * has remised, released and forever discharged * * * Alice Prokop * * * from all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, accounts, reckonings * * *" By this agreement the Union officials intended to release Alice personally from any liabilities she may have incurred to the Union for the shortages revealed by the audit. The name of Edward J. Brown did not appear on the release, and the officials did not contemplate that Brown's name should appear on such release. The release given to petitioner by the Union on November 4, 1947, was prepared by Frederick P. Mett, an attorney, who shared law offices with Brown. After Brown had been discharged from the Union in September of 1947, he practiced law in Milwaukee. At Brown's request, Mett prepared the release, after Brown advised him that the Union was after Alice, and that she was going to turn over some money to the Union and needed the release. Without discussing the release with Alice, Mett inserted all of the handwritten parts of the standard printed release form, with the exception of the amount, and gave the incomplete release to Brown. On November 4, 1947, Brown *208 met detective Doyle and petitioner on the corner of Fourth and Wells Streets, Milwaukee, and gave one of them the release. Brown explained how to properly execute the legal document, but did not indicate how much money was to be involved in the transaction. When Alice turned over the $25,593 in cash to the Union representatives, the total amount of $36,000 was inserted on the printed release form (in the space left blank by Mett) in the handwriting of one of the officers. This amount was later eradicated by Alice and she, in her handwriting, inserted a lesser figure in the amount of $10,407. At an undisclosed date, she changed the amount back to $36,000. On the same day the release was given to petitioner, she signed a statement agreeing not to participate in the affairs of the Union or any of its officers by word or action, and not to file any legal action against the Union (instituted by herself or any of her agents) at any time. On August 6, 1948, the Union sent a letter to petitioner charging that she and her husband had obtained membership in the Union through fraud and misrepresentation in violation of its constitution. Thereafter, their membership cards in the Union were *209 revoked. Purchase of Stock in Electric Sales and Engineering Company by Petitioner During the early part of 1947, when Brown returned from Washington, D.C., he became interested in forming an electric sales and engineering company. As an executive officer of the Union, however, Brown could not be affiliated in any manner with an electric contracting company, since it was both violative of the Union by-laws and the agreement between the Contractors Association and the Union. Brown informed Alice of his intention to acquire a business interest in Electric Sales and Engineering Company, a Milwaukee firm. Subsequently, approximately a total of $12,000 in cash (on three different occasions) was taken from unrecorded permit fees, and temporarily placed by petitioner in a safety deposit box at the Commerce Building Bank. On July 14, 1947, petitioner purchased a bank money order in her maiden name, Alice V. Slizewski, in the sum of $5,000 payable to Walter Henning, an executive of Electric Sales and Engineering Company. On July 20, 1947, she purchased another in the name of Alice Prokop payable to him in the sum of $5,000, and on August 13, 1947, she purchased a third money order in *210 her maiden name payable to Henning for $3,000. Henning, in consideration for the total amount of $13,000 in money orders thus received from petitioner, issued shares of stock in Electric Sales and Engineering Company to her in that amount. In 1947, Edwin H. Herzberg, the executive manager of the Electrical Contractors Association, Milwaukee Chapter, conducted an investigation of the Electric Sales and Engineering based on a report that Brown was becoming interested in said firm. The aforementioned stock purchased by Alice remained registered in her maiden name until the Union and the Association discovered that the stock was so registered, and threatened to deprive the Electric Sales and Engineering Company of its electrical employees unless the stock was transferred to a different owner. On October 31, 1947, petitioner, (using her personal stationery) transmitted the stock certificates of the Electric Sales and Engineering Company to J. Edward Davey, a close personal friend of Brown. As noted hereinabove, in September 1947, the executive board of the Union charged Brown with acquiring an operating interest in the Electric Sales and Engineering Company, contrary to the Union's *211 constitution, and discharged him as business manager of their organization. No stock in the Electric Sales and Engineering Company was ever issued in the name of Brown. Financial Condition of Petitioners From 1935 to 1948, the Prokops resided in a bungalow, occupying the upper attic flat which consisted of three rooms, kitchen and bath. In addition they rented a garage in the rear of the house where they kept their automobile. The rental paid for these premises ranged between $30 and $40 during the taxable years involved herein. In the early part of 1949, the Prokops moved to the Pulaski Avenue Bowling Alley, which they purchased that year, and where they lived for about six months thereafter. (For data re cost of bowling alley, see infra.) While residing there, the Prokops operated the bowling alley business. In August of 1949, they moved to another apartment, where the rental ranged between $48.75 and $104 per month. In July 1951, the Prokops moved into their new home, which they had purchased on March 3, 1951, for about $18,500, subject to a mortgage of about $7,000. New furniture was bought for the house, including bedroom and living room sets, rugs and drapes. These expenditures *212 were made prior to the sale of the bowling alley. On June 1, 1947, the Prokops had a balance of $8,178.34 in their joint savings account at the State Bank of Milwaukee. Alice had $3,655.67 in her individual savings account at said bank. The Prokops also had $4,670.76 in a joint account at the Mitchell Street State Bank. The balances in said accounts total $16,504.77 on that date. There was also an account at the Cudahy State Bank, the amount of which is not disclosed in the record. They likewise kept two safety deposit boxes, one in the Mitchell Street State Bank and another in the Bank of Commerce. During the years 1944 through 1947, inclusive, Alice received a salary of about $50 per week from the Union. Amounts of gross income reported by the Prokops on their State of Wisconsin income tax returns (except where otherwise noted) for the years noted below are as follows: Joint
Alice
Harry
Year
Amount
Amount
Amount
1934
$1,144.00
1935
1,144.00
1936
1,300.00
1937
1,340.00
1938
1,560.00
$2,040.00
1939
1,560.00
2,040.00
1940
1,560.00
2,190.00
1941
3,519.50
2,000.33
1942
2,503.00
2,041.67
1943
1,908.21
2,542.91
1944
1,972.88
2,388.97
1945
2,023.56
2,406.12
1946
2,737.53
2,643.86
1947
2,195.00
3,624.24
1948
216.00
3,396.24
1949
$6,320.77 [1]
1950
[2]
4,306.29
*213 In 1947, Alice paid to the Union the total sum of $36,000. Of this amount, $10,375 was drawn from her own personal bank accounts on November 4, 1947. An unascertained additional part of the $36,000 was represented by the proceeds of the sale, also on November 4, 1947, of certain bonds which belonged to her. Previously, on October 31, 1947, she had turned over $10,407 (also a part of the $36,000) to Ritz, the Union auditor. The source of the $10,407 is not clear from the record, but Alice had made an entry into her safe deposit box on that day. On an occasion in the latter part of September 1947, when Evelyn Sadowski was at the Prokops' apartment, Alice showed Evelyn a money box containing a substantial amount of currency, Alice stating, in effect, that it was money she got from the office. In 1949 the Prokops bought a bowling alley in Milwaukee, the total purchase price being $45,000. They made a down payment of $5,000, borrowed $20,000 on a mortgage, and on August 2, 1949, made an additional payment of $20,000. Alice could not recall from what depository the purchase money was obtained *214 which they used to make the payments totalling $25,000 for the bowling alley. On March 3, 1950, the Prokops had $4,260 in cash in a safety deposit box maintained by them in the Mitchell Street State Bank. As set forth above, they purchased a new home in 1951. The bowling alley was sold in 1953. Financial Condition of Edward J. Brown Edward J. Brown and his wife, Jean, were married in 1915. Up until the early part of 1930 when Edward was appointed business manager of th Union and they moved to Milwaukee, Jean was gainfully employed. Thereafter she did not earn her own livelihood. On his State of Wisconsin Income Tax Returns filed for years 1944 to 1946, inclusive, Edward J. Brown reported his salary to be $12,000 per annum, and $5,400 for the year 1947. In 1941 Brown purchased a farm at Germantown, Wisconsin, for an amount between $7,000 and $10,000, and built a new house thereon at an approximate cost of $12,000 to $15,000. He obtained a mortgage in the amount of $5,000 on said homestead. After Brown was appointed International president, he kept the homestead in Germantown and rented an apartment in Washington, D.C. For about 10 years, the Browns lived in the apartment, paying *215 a rental ranging between $80 to $97.50 per month during those years. Apart from a small parcel of land recorded in the name of Jean Brown and the homestead at Germantown, the Browns did not own any real estate during the years involved herein. During their married years in Milwaukee, the Browns maintained a joint safe deposit box at the Marshall & Illsley Bank. Edward J. Brown also had a personal savings account at Germantown State Bank and a safe at his farm to which his wife had access. When Edward J. Brown died in 1950, his estate inventory had an assessed valuation of approximately $77,000. The total estate valuation included increases in the value of property owned by the Browns over the actual amounts paid for such property. Financial Condition of Fransway E. J. Fransway worked as an electrician in Milwaukee from 1919 to 1936, inclusive. In 1936 he became financial secretary of the Union, but at the same time also remained employed at the electrical trade. Subsequently, he became business representative of the Union and devoted his full time to its organizational activities. In November of 1947, following Brown's discharge from the Union, Fransway became business manager *216 thereof at a starting salary of about $6,760. In 1939, Fransway purchased a home subject to a mortgage of $5,000. The purchase price was not established. He also owned other property which he acquired at a cost of $2,700. During 1946, he purchased certain stocks, the total cost being $3,951.43. One item of stock was sold in that year for $644.08. On his Wisconsin income tax returns for the period involved herein, Fransway reported as taxable gross income the following amounts: Year
Amount
1944
$7,653.77
1945
6,905.99
1946
7,502.33
1947
8,328.33
Financial Condition of the Union After petitioner was discharged from the Union on September 25, 1947, the net worth of the Union increased considerably. The net worth of the Union, as represented by the total of balances in its General Fund and Unemployment Fund at intervals from December 31, 1943, to December 31, 1950, was as follows: Year
Amount
December 31, 1943
$ 66,863.70
June 30, 1944
61,007.40
December 31, 1944
61,128.63
June 30, 1945
62,407.13
December 31, 1945
61,616.28
December 31, 1946
57,539.64
September 30, 1947
81,415.55
December 31, 1947
140,171.46
December 31, 1948
209,026.16
December 31, 1949
237,987.99
December 31, 1950
266,057.23
*217 Ultimate Findings - Fraud A substantial amount of taxable income was omitted from the joint Federal tax return of Alice V. and Harry Prokop for the year 1944. Alice omitted substantial amounts of income from her individual Federal tax returns for each of the years 1945 and 1946. A part of the deficiency for each of the taxable years 1944 to 1946, inclusive, was due to fraud with intent to evade taxes. Opinion Diversion of Union Funds Respondent determined that Alice V. Prokop understated her income in the respective amounts of $43,920.16, $46,073.93, $39,811.68 and $1,941.34 for the years 1944 to 1947, inclusive, and maintains that these amounts were collected by her from temporary permit workers of the Union during the taxable years 1944 through 1947, inclusive, under such circumstances as to constitute the receipt of taxable income to her for such years. In his amended answer, he claims additional understatements under like circumstances. Respondent concedes, however, that because of the repayment of the amount of $36,000 to the Union by Alice in the latter part of 1947 she had no unreported net income for that year if those permit fees which we find to have been diverted *218 in 1944, 1945 and 1946, respectively, constitute taxable income for such years. Alternatively, respondent maintains that if the permit fees which were diverted in 1944, 1945 and 1946 do not constitute taxable income to petitioner for such years, respectively, then, by reason of the release and discharge of any obligation to repay such amounts to the Union given to her on November 4, 1947, she derived taxable income for 1947 in the total amount of the permit fee collections retained by her, less the $36,000 given by her in consideration of the release. Petitioner denies having diverted any of the Union funds in issue for her own benefit. In essence, it is her position that she took the unrecorded permit fees pursuant to the explicit instructions of her superior, Edward J. Brown, an officer of the Union; that a substantial portion of such fees were used at Brown's direction to defray unauthorized expenditures of the Union for illicit activities; and that she turned over the balance of such fees to Brown. In the alternative, Alice contends that if we hold that she retained any of the permit fee money for herself (which she denies) such amounts are nevertheless immune from taxation under *219 the decision of the Supreme Court in Commissioner v. Wilcox, 327 U.S. 404 (1946). The primary issues presented to us are factual, and the question of Alice Prokop's credibility is of great significance. It is so apparent from the record, however, that she is unworthy of belief, that we need only say, without a detailed analysis of the evidence, that her testimony cannot be relied upon. Participation in fraud against the Union, fraudulent alteration of the amount stated in a release, unauthorized endorsement and cashing of checks, and the failure to perform her duty to enter on the books the receipt of permit fees are a few unquestioned circumstances which clearly characterize her. Upon consideration of the entire record and for the reasons hereinafter stated, we are convinced that petitioner (no doubt in collusion with Brown) during the years 1944 through 1947, inclusive, diverted a substantial amount of the unrecorded permit fees in issue to her own benefit, and that such amounts (which we have found to be less than determined by respondent) constitute taxable income to her in each of those years. The record shows, as reflected more fully in our Findings of Fact, *220 that during the taxable years in question, Alice - apparently with the approbation of Brown who was headquartered in Washington, D.C., most of the time - was virtually acting head of the local Union, wielding considerable power and authority over its members and provisional permit workers. She was responsible for the collection of dues and permit fees and the recording of such collections on the books of the Union and no one (other than her collaborator Brown) interfered with or controlled these collections or the disposition thereof. Although the Union books and records were audited periodically, the audits did not include verification of Alice's collections of the permit fees until September 1947. As indicated above, Alice admitted that a substantial amount of permit fees collected by her and under her direction were neither recorded on the books and records of the Union, nor deposited to its bank accounts. The parties have stipulated, as reflected in our Findings, the limited amounts of permit fees which were actually recorded on the books of the Union (labeled "miscellaneous income") and deposited in its safety deposit boxes or accounts. We accept the testimony of the revenue *221 agent who conducted the investigation of petitioners' income tax returns to the effect that Alice informed him (in the presence of her then attorney, Wedemeyer) that the unrecorded permit fee collections were kept in her personal safety deposit box at the State Bank of Milwaukee. At the trial Alice denied making this statement, but we have no reason to doubt the revenue agent and, as already stated, Alice is unworthy of belief. Throughout the instant proceedings, Alice testified evasively concerning the contents of this safety deposit box, indicating vaguely that the box contained some important papers, and some of her cash, the amount of which she could not recall. We think it is of some significance that she entered her personal box on the morning of October 31, 1947, (after auditor Ritz had informed Brown that he suspected a shortage of approximately $10,000) and that later that day she turned over $10,407 in cash to Ritz. We cannot, of course, be sure that the money came from her own box, but her personal interest in the subject matter of the unrecorded permit fees is quite apparent. Her interest in the unrecorded permit fee collections is further evidenced by the fact that *222 in September 1947, when she learned that an independent audit of the books and records of the Union had been ordered, she took steps (in cooperation with Brown) to conceal or destroy all available evidence of the amounts she had collected from temporary permit workers. While there is some conflict in the testimony on this factual question, we are convinced, after a careful consideration of all of the evidence that Alice was an active participant in destroying the payroll records, concealing the original 3 X 5 file cards, and causing the typing of a new set of 3 X 5 file cards, from which the amounts of unrecorded fees could not be ascertained. As counsel for petitioner urges, Brown probably was active in the destruction of the payroll records, and a portion of such records may have been incriminating to him and possibly to others besides Alice. However, the cumulative effect of all the facts in this case leaves no room for doubt that petitioner was also anxious to destroy all inculpative evidence in the hope that she might avoid detection of the diversions in which she participated. That she may have only assisted Brown in this purpose does not alter the conclusion, discussed hereinafter, *223 that they were acting in concert in diverting Union funds, and that she must bear the consequences of her complicity. We were favorably impressed by the testimony of Evelyn Sadowski, and by her demeanor on the witness stand. We are satisfied that Evelyn's testimony relating to the retyping of the 3 X 5 file cards, eliminating notations of the amounts of permit fees collected from each worker, and the attempt by Alice to age the cards, is worthy of belief. We have the same view with respect to Evelyn's testimony that Alice exhibited to her a substantial amount of money which Alice stated she had taken from the office. Alice's apprehension and efforts at concealment are further evidenced by the fact (which we accept as true) that she told Evelyn not to divulge any information to the auditors examining the Union records. We also note that Alice (and Brown) helped to obtain a new job for Evelyn, apparently in an effort to keep her loyalty, and to see to it that she would not be in the Union office after the incident of falsifying the 3 X 5 record cards. That a substantial part of the unrecorded fees were retained by Alice and used for her personal benefit is evident from our analysis *224 of her repayment of some of the permit fees, from her exhibition of funds to Evelyn, from her statements to the revenue agent, and from her expenditures discussed infra. Thus, in 1947, after the Union officials demanded restitution of the missing funds, Alice personally returned $36,000 to the Union. We find no merit in her insistence that all or even a substantial part of said amount was given to her by Brown, and that she was only acting as a "front" for him in the settlement with the Union representatives. The circumstances indicate that the payment of $10,407 in cash to auditor Ritz on October 31, 1947, came from funds which she removed from her safety deposit box, but whether or not we are correct in drawing this inference, it is plain that on November 4, 1947, the day Alice was to reimburse the Union representatives in consideration for the release, she withdrew the total sum of $10,375 from several of her bank accounts, cashed an undisclosed number of United States bonds, and turned over $25,593 in cash to the Union officials. While not of itself determinative of the question of whether or not the balance of these unrecorded permit fees were used by petitioner for her personal *225 benefit, we think it significant, in considering her defense, that in 1949 the Prokops purchased a bowling alley in Milwaukee for the total amount of $45,000 with a down payment of $5,000 and an additional payment of $20,000 apparently made in cash. (The balance was financed by a mortgage.) Alice could not recall from what depository this money might have come, and in effect refused to give any information concerning it. Although the bowling alley was not sold until 1953, in 1951 the Prokops also built a new home at a cost of about $18,500, of which only $7,000 was taken care of by mortgage. Concededly, the Prokops did not live lavishly during the years before us, but in the absence of some other known source of income or assets, it is evident that such substantial expenditures are not consistent with their earnings or their prior accumulations from proper sources, especially when we take into further consideration the substantial amounts which Alice paid to the Union in connection with the 1947 settlement. While we have no more faith in the net worth statements submitted by Alice than we do in Alice herself, we think that, if anything, the statement as of December 31, 1949, accentuates *226 the tenuous position of petitioner because, after the payments in the 1947 settlement and the outlay of $25,000 in connection with the 1949 purchase of the bowling alley (the $25,000 being taken from unidentified sources), the Prokops still had assets of over $12,000 according to the statement, consisting of bonds, cash and bank accounts. In exculpation of her admitted failure to record the permit fee collections in issue, Alice maintains that she retained none of the funds personally, and that all receipts withheld by her were periodically turned over to Brown, who used such funds for illicit activities of the Union. We cannot accept this view. In addition to the fact that we have no faith in the testimony of Alice, the analysis supra of her admitted expenditures and financial resources establish the fact that she must have had sources of funds which she did not disclose at the trial, but which are revealed by the testimony of Evelyn and the agent, together with her actions in relation to the unrecorded permit fees. With respect to petitioner's argument that a substantial part of the unrecorded fees were expended for unauthorized purposes, such as political contributions, purchases *227 of stench bombs and Mickey Finns, hiring of "goons" for malicious destruction of property, "payoffs" to State Labor Relations officials and other illicit disbursements, we have only the unreliable testimony of petitioner, which is contradicted in substance by the officers of the Union who testified that they were aware of no such activities. We are inclined to the belief that some of the money was paid out for unauthorized entertainment, but there is nothing to indicate the amount so expended or that, in the aggregate, the amounts were large. We add for completeness that in one instance presented at the trial to establish the use of permit fees for attorney fees, it is clear that the money spent therefor was in fact paid to the Union by its parent organization. Thus, in September of 1946, the International issued a check to the Union payable to Howard Wilke in the amount of $4,955.12, which Alice endorsed, using Wilke's name. After cashing this check she mailed two money orders totaling $2,498.72 to Wilke, and recorded the disbursement of the full amount of said check in the books of the Union. There is nothing to indicate that Wilke received the difference in cash. Thereafter, two *228 other checks were drawn by the Union payable to Wilke in the respective amounts of $300 and $1,373.20. Again, Alice admittedly endorsed his name on these checks and cashed them. Despite the fact that the Union books show the disbursement of the two latter checks, there is nothing to show that Wilke ever received them or cash equivalents thereof. The indications are to the contrary. In all events, it is clear that whatever payment was made to Wilke was not made out of the unrecorded permit fees. It is also clear that any excess of the amount of the International's check over what was actually paid to Wilke, at least initially came into the hands of Alice, who endorsed his name to the checks and cashed them. In furtherance of her endeavor to shift, principally to Brown, the blame for the diversions in issue, petitioner submitted a certified copy of the inventory of Brown's estate. After carefully considering said evidence, we think there is some indication from the inventory that Brown received income from undisclosed sources, but not in amounts in any way comparable to the large amount of unrecorded permit fees. Our view in this respect will be discussed hereinafter on the issue of *229 the amount of the deficiencies. The attempt on the part of Alice to establish that Fransway also received the benefit of some part of the diverted permit fees is, in our opinion, unsupported by the record. Petitioner, while flatly denying any action on her part in the nature of embezzlement, takes the position that if we find that she received and retained for her own use any of the permit fees during the years in question, we have, in effect, determined that she embezzled such funds, and urges that, under Commissioner v. Wilcox, 327 U.S. 404 (1946), we must immunize her against any tax consequences. We think the circumstances of the instant case are distinguishable from Wilcox, and that Wilcox does not warrant our acceptance of her alternative defense. We note in this connection that the Supreme Court in Rutkin v. United States, 343 U.S. 130 (1952) said: "We do not reach in this case the factual situation involved in Commissioner of Internal Revenue v. Wilcox, * * * We limit that case to its facts. * * *" We think the following distinctions are apparent: 1. In Wilcox, the taxpayer had been convicted of embezzlement. Guilt of the particular crime *230 had been established and adjudicated. In the instant case, petitioner was not accused, charged with, or convicted of embezzlement. Kann v. Commissioner, 210 Fed. (2d) 247 (C.A. 3, 1953) affirming 18 T.C. 1032 (1952), certiorari denied (1954) 347 U.S. 967; Estate of Helene Simmons, 26 T.C. 409, 422, (1956). Cf. J. J. Dix, Inc. v. Commissioner, 223 Fed. (2d) 436. 2. In Wilcox, supra, the Supreme Court said, in part: "* * * had his employer condoned or forgiven any part of the unlawful appropriation the taxpayer might have been subject to tax liability to that extent. But neither situation is present in this proceeding and we need not explore such possibilities. * * *" In Kann, supra, the Court of Appeals made the following statement.. "Next, while it is clear that Wilcox' victim did not forgive or condone him, the Tax Court here found that there was 'no adequate proof that the method if not the act has not been forgiven or condoned.' * * *" The defense of embezzlement in the instant case is likewise an affirmative one. As in Kann, supra, there is likewise no adequate proof *231 here that neither the method nor the act was condoned. Of course, the effect of the release to Alice in 1947 (for which she paid $36,000 to the Union) was to forgive her from any further liability for diverted permit fees. 3. In Wilcox, supra, the Supreme Court also said, in part: "Sanctioning a tax under the circumstances before us would serve only to give the United States an unjustified preference as to part of the money which rightfully and completely belongs to the taxpayer's employer." It is clear that as a result of the release to Alice, there is no occasion for concern on this score in the instant case. In Kann, supra, where the petitioners were in a financial position to make good their defalcations (thus, although in a different way, obviating the likelihood of preference which concerned the Supreme Court) the Court of Appeals referred to the circumstance as "another relevant distinction between this case and Wilcox." Since the defense of embezzlement under the doctrine of Wilcox, supra, is not established, and in the light of the circumstances discussed in paragraphs one and two in distinguishing Wilcox, we cannot agree with *232 petitioner's contention that the income arising from the diversion of the permit fees is taxable only in 1947, the year of the release to Alice. On this issue, we follow the principles expressed in Dawkins v. Commissioner, 238 Fed. (2d) 174 (C.A. 8, 1956) affirming in part a Memorandum Opinion of this Court [14 TCM 684; T.C. Memo. 1955-178]. The case involved, among other issues, the year of taxability of funds of a corporation diverted by an officer-stockholder. Holding such proceeds taxable in the year of receipt, the Court said: "The status of the funds is determined as of the date of the taking, and the fact that subsequent to the tax years here involved a portion of the funds was returned in no way affects Dawkins' liability for taxes in the years here in question. See Healy v. Commissioner, supra; Soreng v. Commissioner, 7 Cir., 158 Fed. (2d) 340 * * * The Tax Court was warranted in treating the diverted sales receipts as income to Dawkins in the year in which the diversions occurred, and this result follows regardless of the label placed upon the diverted income." We note also the significant language of Judge Learned *233 Hand in National City Bank of New York v. Helvering, 98 Fed. (2d) 93, 96 (C.A. 2, 1938) in which he said: "* * * collection of the revenue cannot be delayed, nor should the Treasury be compelled to decide when a possessor's claims are without legal warrant. * * *" On the basis of the foregoing discussion, and having held that the instant case does not fall within the doctrine of Wilcox, supra, we conclude that the diverted funds are taxable under section 22(a) in the years in which diverted. See United States v. Chapman, 168 Fed. (2d) 997, (C.A. 7, 1948) certiorari denied 335 U.S. 853; Briggs v. United States, 214 Fed. (2d) 699 (C.A. 4, 1954) certiorari denied 348 U.S. 864; Marienfeld v. United States, 214 Fed. (2d) 632 (C.A. 8, 1954) certiorari denied 348 U.S. 865; Schira v. Commissioner, - Fed. (2d) - (C.A. 6, 1957) affirming a Memorandum Opinion of this Court [15 TCM 155; T.C. Memo. 1956-35]. Understatements of Taxable Income Respondent's determination of deficiencies for each of the years is, of course, prima facie correct, and except as to *234 new matter pleaded by him, the burden is upon petitioner to establish error in such determinations. The understatements determined for the respective years were $43,920.16 for 1944; $46,073.93 for 1945; $39,811.68 for 1946; and $1,941.34 for 1947. Since respondent concedes that petitioner is entitled to a deduction in 1947 for the $36,000 paid by her to the Union, it is clear that there is no deficiency for that year. For the years 1944, 1945 and 1946, petitioner claims that she received none of the proceeds of the unrecorded permit fees for herself, and asserts that all went to Brown or for Union purposes. She also claims that respondent made no allowance for delinquent or uncollected permit fees. As to the last factor, our examination of the record indicates to us that respondent's determination, to the extent that it reflected diverted permit fees, was conservative, and on a minimal basis, and that the effect of it, intentionally or otherwise, was to make ample allowance for uncollected permit fees. As to the other two factors, involving the amounts, if any, which went to Brown or were used for Union purposes, the problem is not free from difficulty. As stated several times, *235 we think that petitioner is unworthy of belief. Certainly she has not met her burden of establishing substantial, definite or calculable amounts paid to Brown or used for the Union. We repeat, also, that the understatements determined, when viewed in the light of the amounts of permit fees diverted (rather than with respect to those who benefited therefrom and in what amounts) were conservative. Nevertheless, upon consideration of the entire record, we believe that Brown, although absent from Milwaukee during most of the periods involved, did receive some part of the diverted funds. We also believe that some part of the diverted funds (small in comparison to the amounts diverted) were used for entertainment purposes of doubtful propriety by officers of the Union. We think, despite the failure to establish definite amounts passing to Brown, or used for entertainment as indicated above, we are justified, in order to avoid a harsh and unrealistic result, in applying the principles of Cohan v. Commissioner, 39 Fed. (2d) 540 (1930), at the same time, of course, resolving any doubts in the exercise of our judgment against petitioner, with whom the burden of proof rests. After *236 careful consideration, we have reduced respondent's determination for each of the years 1944, 1945 and 1946, by 25 per cent, and find understatements for the three years, respectively, in the amounts of $32,940.12; $34,555.45; and $29,858.76. In view of our determination, and our discussion in relation thereto, it is unnecessary to consider respondent's alternative argument that if the diverted permit fees are not taxable in 1944, 1945 and 1946, they should be taxed in 1947 when the release was executed. Increased Deficiencies Claimed As to increased deficiencies and additional understatements claimed, the burden of proof is on respondent. Broaly speaking, we think the methods used by him in calculating unrecorded permit fee is sound in principle, but we think the foundation evidence on which he relies is skimpy and speculative. Moreover, while perhaps not of great significance, it would appear that he has not taken into consideration in his claim the amount of delinquent and uncollected permit fees. If these were the only factors to be considered, we would not have much difficulty in arriving at minimal amounts. We cannot, however, disregard the fact that, bearing the burden *237 of proof, he has failed to establish what additional amounts, if any, were diverted by Alice as distinguished from Brown. He has also failed to establish any limit on the amounts which may have been used for the Union itself. Whether such amounts were properly expended or not is beside the point. The focus here must be upon meeting the burden of proving how much, if anything, Alice diverted to her own use in excess of the amounts attributed to her in our discussion of the deficiencies determined for 1944, 1945 and 1946. We realize, and can sympathize with the heavy, if not impossible burden resting upon respondent in this connection, but we have no basis or authority for establishing the facts for him. In view of the foregoing, we must deny respondent's affirmative claim for increased deficiencies. Fraud Issue Respondent contends that a part of the deficiency determined for each of the years 1944 through 1946, inclusive, (there being no deficiency for 1947) was due to fraud with intent to evade tax within the meaning of section 293(b). The burden of proof with respect to fraud is upon the respondent, and he must establish fraud on the part of petitioner by clear and convincing *238 evidence. Bodoglau v. Commissioner, 230 Fed. (2d) 336 (C.A. 7, 1956); Arlette Coat Co., 14 T.C. 751 (1950). It should be noted at the outset that our conclusions in these respects must be based upon consideration of the entire record properly before us, and that we are not limited to a consideration of respondent's affirmative evidence. Frank Imburgia, 22 T.C. 1002 (1954); Wallace H. Pettit [Petit], 10 T.C. 1253 (1948); L. Schepp Co., 25 B.T.A. 419 (1931). We also recognize that in this, as in many fraud cases, the proof of fraud, if it is to be established, must depend in some respects upon circumstantial evidence. Fraudulent intent can seldom be established by a single act or by direct proof of the taxpayer's intention. It is usually found by surveying his whole course of conduct and is to be adduced as any other fact from all the evidence of record and inferences properly to be drawn therefrom. M. Rea Gano, 19 B.T.A. 518 (1930); United States v. Rosenblum, 176 Fed. (2d) 321 (C.A. 7, 1949). In the instant case, our finding of an understatement in taxable income for each of the years *239 for the purpose of the deficiencies involved was based in material respects upon petitioner's failure to overcome the presumptive correctness of respondent's determination. We recognize that respondent cannot meet his burden of establishing fraud on the basis of petitioners' failure to discharge the burden of proving error in respondent's determination of deficiencies, and we do not, of course, rest our finding of fraud on that basis. The existence of fraud with intent to evade tax must be affirmatively established by respondent. See Drieborg v. Commissioner, 225 Fed. (2d) 216 (C.A. 6, 1955). After a painstaking analysis of all of the evidence in this case, and bearing in mind the above stated principles, we are convinced that Alice received taxable income during each of the years 1944, 1945 and 1946 (from the diversion of permit fees) in excess of that reported on the joint return for 1944 and on her individual returns for 1945 and 1946, and that in each of said years a part of the deficiency was due to fraud with intent to evade taxes. It is well settled that respondent, in sustaining his burden of proof of fraud, need not prove the precise amount of the deficiency *240 due to such fraud, but only that a part of the deficiency is attributable thereto. United States v. Chapman, supra; Estate of W. Y. Brame, 25 T.C. 824, 831 (1956) [on appeal, C.A. 5]. The record shows that in each of the years in question, Alice admittedly failed to record substantial amounts of permit fees on the books of the Union, and that she removed substantial amounts of such fees in each of said years from the Union's cash drawer and safe. It is true that the record does not show the precise amount she retained for her own advantage, but we are convinced from the entire record (and recognizing that petitioner's failure to overcome the presumptive correctness of respondent's determination is not material to the issue of fraud) that Alice diverted a large amount thereof during each of the taxable years involved to her own use, and that she knowingly failed to report such amounts on her Federal tax returns with the fraudulent intent to evade taxes. See Murray Humphreys, 42 B.T.A., 857, 880 (1940), affd. (C.A. 7, 1942), 125 Fed. (2d) 340. The record is replete with facts and convincing circumstantial evidence which sustain *241 the view that respondent has met his burden of establishing that petitioner knowingly and intentionally evaded her taxes during each of said years. We have set forth the material facts in our Findings, and need not repeat them here. We merely advert to the following summary: That Alice kept a large part of such permit fees in her own safe deposit box; that she displayed to Evelyn Sadowski a substantial amount of cash at her home which she stated she had brought from the office; that she paid $36,000 to the Union in 1947, at least $10,375 of which came from her own bank accounts, together with the proceeds, undetermined in amount, of the sale of her own bonds; that in 1949 she and her husband made cash payments of $25,000 (the source of which she could not explain) for the purchase of a bowling alley; that in 1951 they paid more than $11,000 (over and above the mortgage) for a house; and that as of December 31, 1949, she and her husband had more than $12,000 in bonds, bank accounts and cash in safe deposit boxes. While we do not know how much cash she really kept in her safe deposit box, or how much she displayed to Evelyn, the amounts of her ascertained expenditures referred to above, *242 together with the assets which she and her husband had at the end of 1949 (in addition to the bowling alley) were materially in excess of all assets acquired by her and her husband from explained sources. Her complete inability to explain the source of the $25,000 cash paid (in excess of the mortgage) for the bowling alley in 1949 is particularly significant. That Alice had access to and removed permit fees from the Union office during 1944, 1945 and 1946 is not denied. Moreover, although she took the stand in her own defense and testified at great length, she could suggest no source for at least a substantial amount of her and her husband's assets and expenditures. We think the facts and circumstances developed in the record point inevitably to the diverted permit fees as the explanation. In addition to the aforementioned circumstances, the record affirmatively established that Alice cashed spurious checks drawn on Union accounts, and falsified the Union books to reflect them as Union disbursements; falsified endorsements on checks; altered the provisions of the 1947 release; cooperated with Brown in concealing the true ownership of stock; secreted unrecorded Union receipts in her *243 own safety deposit box; attempted to deter the auditor, Ritz, from examining the books and records of the Union; cooperated in the destruction of vital payroll reports; concealed or destroyed (3 X 5) file cards from which the unrecorded permit fees could have been ascertained, and had new cards typed and "aged" which omitted significant data relating to permit fees. All of the defalcations, manipulations, concealments and diversions discussed above were made by, or with the active cooperation of Alice. That she committed these acts in large measure to avoid detection is apparent. That the failure to include the proceeds of her diversions of permit fees in the income tax returns for 1944, 1945 and 1946, was willful and fraudulent on the part of Alice is clear. Her entire course of conduct was one of fraud and concealment against the Union, and was, in our opinion, no less so in her failure to meet her obligations as a taxpayer. Her attorney quite properly raised the defense of embezzlement on the issue of deficiencies. Not even he (or Alice) suggests that her failure to report her income from the diversion of permit fees was due to a belief on her part at the time of preparation and *244 filing of her returns that she was an embezzler and for that reason was not required to include such income. We have already held that Commissioner v. Wilcox, supra, is not here applicable on the issue of deficiencies in income tax. As to intent on the issue of fraud, we think it clear that the position Alice takes is merely an afterthought. See Briggs v. United States, 214 Fed. (2d) 699, 702 (C.A. 4, 1954) certiorari denied, 384 U.S. 864. That petitioner's diversions were a fraud on the Union, and that many of her other acts were committed in an effort to avoid detection of such frauds does not alter the fact that she also intended to evade Federal income tax on the amounts diverted. In this connection, the Supreme Court, in Spies v. United States, 317 U.S. 492, (1943) said (p. 499): "By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs *245 to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. If the tax-evasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime." [Italics supplied.] We hold, therefore, that a part of the deficiency in each of the years 1944, 1945 and 1946, was due to fraud on the part of Alice with intent to evade taxes. For the year 1944, for which Alice and her husband filed a joint return, the spouses are jointly and severally liable for the entire tax and additions thereto, even though the fraud was on the part of Alice. Myrna S. Howell, 10 T.C. 859 (1948), affd. 175 Fed. (2d) 240 (C.A. 6, 1949). Additions to Tax under Subsection 294(d) Respondent, in his statutory notice, determined additions to tax under section 294(d) of the 1939 Code for each of the years in question. Petitioner, on whom the burden of proof rests, has offered no evidence on this issue. We have no occasion, therefore, to discuss the problem here except to say that the appropriate amounts of any such *246 additions will be determined under Rule 50 in the light of the conclusions reached in our Opinion. Decisions will be entered under Rule 50. Footnotes
1. Part of the funds turned over to the Union included a check in the amount of $5,000 drawn in 1946 on the Union's checking account and made payable to "cash," which had been placed in the safety deposit box in the State Bank of Milwaukee. The disbursement is supported by a voucher authorized by Schroeder, the Union's president, and the check is reflected on the books of the Union as "convention expenses." This check, however, was never used for such purpose. In 1946, after Brown had been defeated as International President, he admonished the executive board that the International would probably attempt to seize control of the Union's treasury. The executive board, therefore, decided to set aside the $5,000 check from the General Union as a preliminary protective measure against the International.↩
1. Adjusted gross income from joint Federal return. ↩
2. No return included in the record.↩